[Cite as *Morlatt v. Johnson*, 2022-Ohio-4155.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| Kenneth Morlatt, II, et al., | : | Case No. 21CA1142 |
| Plaintiffs-Appellees, | : | |
| v. | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| Steve Johnson, et al., | : | |
| Defendants-Appellants. | : | **RELEASED 11/17/2022** |

_____
<u>APPEARANCES</u>:

Christopher J. Mulvaney, The Mulvaney Firm, LLC, Cincinnati, Ohio, for appellants Steve and Denise Johnson.

David E. Grimes, West Union, Ohio, for appellee Kenneth Morlatt II.[1]
_____
Hess, J.

{¶1}   Steve and Denise Johnson appeal from a judgment of the Adams County Common Pleas Court in favor of Kenneth Morlatt II and Tasha Morlatt on their claims against the Johnsons for invasion of privacy and absolute nuisance.  In their first assignment of error, the Johnsons assert that the judgment on the invasion of privacy claim is against the manifest weight of the evidence.  In their second assignment of error, the Johnsons assert that the judgment on the absolute nuisance claim is against the manifest weight of the evidence.  And in what we will treat as their third assignment of error, the Johnsons assert that the trial court erred when it awarded attorney fees to the

---

[1] Attorney Grimes represented Kenneth Morlatt II and Tasha Morlatt at the trial level.  On appeal, Attorney Grimes filed, on behalf of Mr. Morlatt, a notice of intent not to file an appellee's brief.  Attorney Grimes did not file a similar notice on behalf of Mrs. Morlatt, and she did not file an appellee's brief.

Morlatts.  For the reasons that follow, we sustain the assignments of error, reverse the trial court's judgment, and remand for further proceedings consistent with this opinion.

## I.  FACTS AND PROCEDURAL HISTORY

**{¶2}**    The Johnsons and Morlatts own abutting properties in Adams County.  The Morlatt property is north of the Johnson property.  The boundary between the properties was the subject of Adams County case number 2008CVH0225, which Sharon Rivers, the Morlatts' predecessor-in-interest, initiated against the Johnsons in 2008.  Evidently, the Johnsons believed the boundary between the properties was in the same location as a fence north of Stoney Road, a public right-of-way.

**{¶3}**    On April 16, 2009, the trial court issued a judgment entry finding that the Rivers property "is connected to Stoney Road as evidenced by the language of each parties' deed and the existence of a right-of-way," that the Johnsons failed to establish that the fence line was the property line under the doctrine of acquiescence, but that the "remaining fence west of Stoney Road between the parties' properties that does not parallel Stoney Road is the boundary line between the two properties."  The court found that Rivers "shall not enter her property at any location where the road right-of-way does not extend beyond the survey pins.  Specifically, [Rivers] shall not access her property at the gate located closest to the [Johnsons'] residence."  On June 5, 2009, the Morlatts purchased the Rivers property.

**{¶4}**    In September 2019, the Morlatts filed a complaint against the Johnsons, Stephanie Myers (the Johnsons' daughter), and Justin Myers (the Johnsons' son-in-law) which contained the following allegations.  In 2007 and 2008, the Johnsons made false statements that they owned land north of Stoney Road and that Rivers's parcel was

landlocked. As a result, Rivers filed a lawsuit, and the trial court rejected the Johnsons' claims, including that a fence north of Stoney Road was the boundary between the properties of the Johnsons and Rivers. The Morlatts then bought Rivers's property. In 2019, the Johnsons "renewed" their claims that they owned property north of Stoney Road and drove metal fence posts onto the Morlatt property in the approximate location of the fence line at issue in the prior litigation. The Morlatts removed the posts and tried to return them to the defendants. The defendants "repeatedly threatened and harassed" the Morlatts and their guests.

**{¶5}** The Morlatts alleged a claim for invasion of privacy against all of the defendants asserting that they wrongfully and intentionally intruded, physically and otherwise, into the private activities, solitude, and seclusion of the Morlatts in a highly offensive manner. The Morlatts alleged a claim for malicious prosecution against Mr. Johnson asserting that he had signed an affidavit alleging that Mr. Morlatt deprived him of 12 "metal t-posts," that the affidavit resulted in criminal mischief charges being filed against Mr. Morlatt, that Mr. Johnson lacked probable cause to institute that criminal prosecution, and that the charges had been dismissed. The Morlatts alleged a claim for trespass against all of the defendants for putting the posts on the Morlatt property without permission. Finally, the Morlatts alleged a claim for absolute nuisance against all of the defendants asserting that they had intentionally and unreasonably made threats to the Morlatts and their guests and made false claims that the Morlatts were trespassing, which caused annoyance and inconvenience to and endangered the comfort, health, and safety of the Morlatts and their guests.

### A. Bench Trial and Judgment

{¶6}    The matter proceeded to a bench trial during which the attorneys orally agreed that on an aerial map of the Morlatt and Johnson properties, which we have included as an appendix to this decision, the solid line running roughly west to east represents the boundary between the Morlatt and Johnson properties. Stoney Road is depicted below this property line. On the map, the eastern part of Stoney Road appears to be parallel to the property line but the western part is not because at a certain point, the road curves southwest. Stoney Road is gravel, but there is a grassy area north of the road/gravel which includes a ditch and is part of the public's easement. The Johnsons own the property on which the easement is located. The attorneys orally agreed that the "Stoney Road easement runs up against the boundary line between the Morlatt property and the Johnson property." In response to questioning by the court during opening statements, the defendants' attorney acknowledged the southern edge of the Morlatt property abuts the northern edge of the Stoney Road easement until the road curves, at which point there is space between the Morlatt property and the easement. However, the attorney took the position that under the 2009 entry, the Morlatts could not access their property from Stoney Road because they had to show their property "doesn't just abut to the right-of-way easement, but extends into" it.

{¶7}    Mr. Morlatt testified that in 2008, he and his wife were looking for property for a retreat for their family and began to consider the Rivers property. When they went to view the Rivers property, they had a problem entering it because Mr. Johnson accused them of trespassing. Mr. Morlatt told Rivers that he would not buy her property until the issue was resolved. After the court "settled the dispute," the Morlatts bought the Rivers

property.  Mr. Morlatt testified that they bought the property with the intent of building their "future home" on it, but "that was all stopped when Mr. Johnson said he owns the property. And going through court with Sharon Rivers we wanted to build a home.  Well, we didn't get to build our forever home there so we had a problem with this, so we had to build out in Bethel."  Mr. Morlatt did not elaborate on how anything Mr. Johnson did after the Morlatts bought the property interfered with the Morlatts plans to build a home for themselves on it.

{¶8}    Mr. Morlatt testified that the Morlatts only went to their property two or three times a year, "just enough to bush hog it down when we got high."  Mr. Morlatt did not testify about any interactions with the Johnsons between the time the Morlatts bought their property in 2009 until 2018, when the Morlatts began to establish a home on the property for their daughter in order to shorten her commute to Shawnee State University. The Morlatts put a mobile home on the property, and Mr. Morlatt made efforts to get electric service on the property.  Mr. Morlatt asked Mr. Johnson if he would let Mr. Morlatt get electricity via one of Mr. Johnson's poles.  Mr. Johnson said no.  Mr. Morlatt testified that another neighbor agreed to let him "tap off" the neighbor's pole, but Mr. Johnson "restrained" the electric company from accessing the Morlatt property.  The trial court admitted into evidence a letter from the company's general manager which states that a crew went to the Morlatt property on November 28, 2018 "to begin the construction of [a] primary line for a new service."  Mr. Johnson "confronted" the crew upon their arrival and said "they did not have permission to access the land and that he owned it."  The crew removed their equipment and left. The next day, Mr. Johnson told the company's operations manager that he "owned the north side of Stoney Road," and the company

"could not access it to construct the lines for the new service for Mr. Morlatt." Mr. Morlatt testified that the electric company had to find an alternate route and that he got electricity to his property, but "it took a long while."[2]

{¶9}    Mr. Morlatt testified that on May 8, 2019, he went to his property to pick a location to construct a driveway to Stoney Road. He knew that he could not place the driveway in the area where Stoney Road is not parallel to his property—which is where the gate referenced in the 2009 entry was—so he picked a spot east of where Stoney Road curves, between two oak trees. Evidently he left the property, and when he returned with a group to construct the driveway, Mr. Morlatt discovered that fence posts had been "driven down through the front" of his property. Mr. Morlatt decided to construct the driveway further east from the spot he had originally selected. The group began to clear and prepare the newly selected spot, and Mr. Morlatt directed his father and another man to remove the posts.

{¶10} Mr. Morlatt and another member of the group wore body cameras during the construction, and the Morlatts introduced two videos into evidence. One video depicts Mrs. Myers standing on the road while having a disagreement with members of the group about her belief that there is no access to the Morlatt property from Stoney Road and that the group is trespassing on her father's property. After that video was taken, Mrs. Myers left the road and contacted law enforcement at the request of Mr. Johnson.

---

[2] Some of the testimony about the incident with the electric company is confusing. However, it appears that the electric company was trying to use the Stoney Road easement to access the Morlatt property to set up electric service to the property from the unnamed neighbor's pole and was not trying to set up electric service from a pole on the Johnsons' property or install equipment on the Johnsons' property without their permission.

{¶11} In the second video, Mrs. Myers has returned to Stoney Road and is yelling at Mr. Morlatt's father, who is carrying about five posts down the road, and Mrs. Myers says they are "not his property to remove." Mr. Myers asks for the posts. Mr. Morlatt's father hands the posts to Mr. Myers, who throws them in the middle of the road and yells at Mr. Morlatt. Mr. Johnson walks down the road and accuses the group of pulling the fence posts out of his property line. A deputy arrives and has a discussion with Mr. Johnson and Mr. and Mrs. Myers. The deputy reviews a document, and Mr. Johnson can be heard saying the "road right-of-way is the property line." The deputy tells Mr. Morlatt's group, which is in the process of dumping gravel, to halt the driveway construction until the matter is resolved and says they are going to wait "about 30 minutes." There is further discussion about whether Mr. Morlatt can access his property in the vicinity of the driveway construction. The video ends before the deputy leaves, but Mr. Morlatt testified that law enforcement concluded the dispute was a civil matter and allowed the construction to recommence, and the driveway was completed. Mr. Morlatt testified that he also had footage of Mrs. Johnson from the driveway incident, which was not introduced at trial, and that she said "if anybody put one shovel in the dirt it would be a big mistake."

{¶12} On May 20, 2019, Mr. Morlatt was charged with criminal mischief based on an affidavit in which Mr. Johnson alleged that "Kenneth Morlatt" had taken 12 metal t-posts which belonged to Mr. Johnson. According to Mr. Morlatt, the only posts his group removed were the ones in the video footage, and they were not exactly on the property line but were rather "going in and out" of it. Evidently the Johnsons did not retrieve the posts from where Mr. Myers threw them on the road. Pursuant to an officer's instruction, Mr. Morlatt put them in the ditch, but he later moved them to his truck so "the county"

would not "run over them and bush hog and tear their equipment up." The criminal mischief charge was dismissed on the ground that the case involved "a property line dispute which is a civil matter."

{¶13}   Mr. Morlatt testified that the Johnsons and Myerses had made it impossible for him to enjoy his property.   Mr. Morlatt had not been there "in a long time" because he did not want problems with the Johnsons and feared additional criminal charges, which could jeopardize the Morlatts' license to be foster parents.   There was still a mobile home on the Morlatt property, but no one was living in it.   Mr. Morlatt did not want his daughter living there "with all the problems."   He feared she would be treated like he was during the driveway incident.   At one point, Mr. Morlatt implied that the decision to not let his daughter live on the Morlatt property resulted in her discontinuing her education at Shawnee State University.   Mr. Morlatt testified that the issues with the Johnsons and Myerses impacted him financially because he has had to pay court costs and attorney fees.

{¶14}   Mr. Johnson testified that the 2009 entry prohibits the Morlatts from using Stoney Road to access their property because they do "not own property into the right-of-way," so they must use State Route 73 to access their property.   Mr. Johnson admitted that he made contact with an electric crew around November 28, 2018.   Mr. Johnson testified that "[i]t was all muddy and they had the place all tore up.   The ditch line tore up, the property line, getting those trucks in and out of there [sic]."   He pointed the survey pins out to the crew.   Stevie Hook, the crew leader, asked Mr. Johnson, "You own to

there?" and Johnson evidently responded, "Yes, I do."[3] Hook told the crew, "Shut it down. Get them trucks out of there [sic]." Hook asked Mr. Johnson whether he cared if the crew left via Stoney Road. Mr. Johnson said, "Absolutely not. I don't care if you boys bring those trucks back out here." Later, someone from the electric company told Mr. Johnson they were not going to cross his property line anymore and would "go down to the old man in the trailer below." On December 28, 2018, an attorney sent Mr. Morlatt a letter on behalf of the Johnsons stating that he was violating a court order by entering his property via Stoney Road and asking him to refrain from doing so. The letter led to further correspondence between the Johnsons' and Morlatts' attorneys which is not in evidence.

{¶15} Mr. Johnson testified that on the day of the driveway incident, he saw a group bringing in equipment and asked Mrs. Myers to investigate. The Johnsons went to Stoney Road when they saw the group dumping gravel. Mr. Johnson denied initiating a criminal charge against Mr. Morlatt. Mr. Johnson believed the affidavit he signed about the fence posts related to Mr. Morlatt's father, who has the same name as Mr. Morlatt but does not use the name suffix "II." Mr. Morlatt's father is the person Mr. Johnson saw removing his fence posts from the property line. The Johnsons introduced into evidence photographs of a metal post. Mr. Johnson testified that the post was in the same spot one of the removed posts had been, which was one or two inches south of a pin which marks the northern boundary of the easement and the Johnson property. Mr. Johnson testified that the fence at issue in the litigation with Rivers was about a foot and a half north of the pin. Mr. and Mrs. Myers also testified.

---

[3] While testifying about the conversation with Hook, Mr. Johnson stated: "And he says: 'You own to there?' And he said: 'Yes, I do.'" The testimony suggests Hook answered his own question even though that does not make sense under the circumstances. Thus, it appears there was either an error in the transcript or Mr. Johnson made a misstatement.

**{¶16}** On August 5, 2020, the trial court issued a judgment entry finding that the "Plaintiff's [sic] have a legal right to access the easement in question where Plaintiff's [sic] land meets/adjoins the easement boundary." The court ruled in favor of the Morlatts on their claims against the Johnsons for invasion of privacy and absolute nuisance. The court ruled against the Morlatts on their remaining claims. The court ordered the Johnsons to pay the Morlatts $5,265.00, i.e., the amount of attorney fees which the court orally told the parties it planned to award at the end of the trial. The court also ordered the Johnsons to pay all court costs.

### B. Post-Judgment Proceedings

**{¶17}** The docket contains a notation of the following event on August 7, 2020: "COPY OF JUDGMENT ENTRY MAILED TO THE FOLLOWING BY REGULAR U.S. MAIL: R AARON MAUS," i.e., the defendants' attorney. However, on July 27, 2021, an affidavit of the clerk of courts was filed in which the clerk averred that "[t]he Adams County Clerk of Courts office [p]rocessed the [August 5, 2020 judgment] entry on August 7th, 2020 and same was noted in the docket," but "a Deputy Clerk held the mailing and it was not issued from this office until August 17th, 2020." The trial court scheduled a hearing "in regards to the appropriateness of reopening the appeal period."

**{¶18}** On August 25, 2021, the court issued an entry stating that it had conducted the hearing, that "[t]here were concerns that the parties were not afforded all appellate rights due to questions about timeliness of mailing an appealable entry from the Clerk of Courts to the parties and counsel involved," and that the clerk of courts had acknowledged "the inordinate delay in service of notice of the [August 5, 2020] judgment entry." The court ordered that the appeal period "be renewed for thirty (30) days upon the filing of" its

entry ordering the renewal.  The Johnsons filed their notice of appeal from the August 5, 2020 entry on September 24, 2021.

## II.  ASSIGNMENTS OF ERROR

**{¶19}**  The Johnsons present two assignments of error:

I.      The Trial Court's Decision granting Judgment in favor of Plaintiffs and against Defendants Steve and Denise Johnson on Count I, Invasion of Privacy, was against the manifest weight of the evidence.

II.     The Trial Court's Decision Granting Judgment in Favor of Plaintiffs and against Defendants Steve and Denise Johnson on Count 4—Absolute Nuisance, was against the manifest weight of the evidence.

**{¶20}**  Under the second assignment, the Johnsons state that one of the issues presented for review is:  "The Trial Court Erred in awarding attorney's fees to Plaintiffs/Appellees."  This issue is beyond the scope of the topic specified in the second assignment of error.  Therefore, it should have been characterized as a separate assignment of error, and we will treat it as the Johnsons' third assignment of error.  *See Chase Bank, USA v. Curren*, 191 Ohio App.3d 507, 2010-Ohio-6596, 946 N.E.2d 810, ¶ 8 (4th Dist.) (treating issue within one of appellant's two assignments of error which bore "no relation to any of the topics specified in that assignment" and "should have been characterized as a separate assignment of error" as the appellant's third assignment of error).

## III.  TIMELINESS OF THE APPEAL

**{¶21}**  Initially, we consider the timeliness of this appeal.  "App.R. 4 governs the timing of appeals and must be carefully followed because failure to file a timely notice of appeal under App.R 4(A) is a jurisdictional defect."  *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 17.  App.R. 4(A)(1) states:  "Subject to the provisions of

App.R. 4(A)(3), a party who wishes to appeal from an order that is final upon its entry shall file the notice of appeal required by App.R. 3 within 30 days of that entry." The Johnsons filed their notice of appeal from the August 5, 2020 entry on September 24, 2021, i.e., more than 30 days after the entry.

{¶22} Nothing in the appellate rules authorizes a trial court to enlarge the time for appeal in App.R. 4 based on a delay of clerk's service; however, App.R. 4(A)(1) is subject to App.R. 4(A)(3), which states: "In a civil case, if the clerk has not completed service of notice of the judgment within the three-day period prescribed in Civ.R. 58(B), the 30-day periods referenced in App.R. 4(A)(1) and 4(A)(2) begin to run on the date when the clerk actually completes service." Civ.R. 58(B) states:

> When the court signs a judgment, the court shall endorse thereon a direction to the clerk to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal. *Within three days of entering the judgment upon the journal*, the clerk *shall serve the parties in a manner prescribed by Civ.R. 5(B) and note the service in the appearance docket. Upon serving the notice and notation of the service in the appearance docket, the service is complete*. The failure of the clerk to serve notice does not affect the validity of the judgment or the running of the time for appeal *except as provided in App.R. 4(A)*.

(Emphasis added.) " 'Pursuant to Civ.R. 58(B), the clerk must * * * indicate *on the docket* the names and addresses of the parties it is serving the judgment upon, the method of service, and the costs associated with the service. When these steps are followed, there is no question whether service was perfected according to rule.' " (Emphasis sic.) *In re E.S.*, 4th Dist. Pickaway Nos. 17CA16, 17CA17, 2018-Ohio-1902, ¶ 20, quoting *Clermont Cty. Transp. Improvement Dist. v. Gator Milford, L.L.C.*, 141 Ohio St.3d 542, 2015-Ohio-241, 26 N.E.3d 806, ¶ 3. "[T]he thirty-day time to appeal does not

begin to run until the clerk serves notice and notes service in the appearance docket in accordance with Civ.R. 58(B), as interpreted in *Gator Milford*." *Id.* at ¶ 21.

{¶23} In this case, there is a notation in the docket that the clerk sent a copy of a judgment entry—presumably the August 5, 2020 judgment entry—to the Johnsons' attorney by regular U.S. mail on August 7, 2020. The notation is incomplete because it does not include counsel's address or the costs associated with the service, and it is false because the clerk averred that a deputy clerk inexplicably "held the mailing," so the clerk's office did not in fact mail the August 5, 2020 entry until August 17, 2020. Because the clerk did not complete service of notice of the August 5, 2020 judgment within the three-day period prescribed in Civ.R. 58(B), App.R. 4(A)(3) applies, and the 30-day period in App.R. 4(A)(1) begins to run on the date the clerk actually completes service.

{¶24} The clerk has not yet completed service of the August 5, 2020 entry in accordance with Civ.R. 58(B). Although the clerk averred that the entry was mailed on August 17, 2020, the clerk made no notation of service on that date in the docket. Therefore, the 30-day period in App.R. 4(A)(1) has not yet begun to run, and we consider the Johnsons' appeal to be timely.

### IV.  MANIFEST WEIGHT OF THE EVIDENCE

#### A.  Standard of Review

{¶25} In reviewing whether a trial court's decision is against the manifest weight of the evidence, an appellate court

> weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.

Moreover, when reviewing the evidence under this standard, we are aware that the weight and credibility of the evidence are to be determined by the trier of fact; we thus defer to the trier of fact on these issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. The trier of fact is free [to] believe all, part, or none of any witness's testimony.

Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the decision.

(Citations omitted.) *Wootten v. Culp*, 2017-Ohio-665, 85 N.E.3d 198, ¶ 19-21 (4th Dist.).

**{¶26}** App.R. 12(C)(1) provides that when a civil action is tried to the trial court and a majority of judges hearing the appeal

find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

B. Invasion of Privacy

**{¶27}** In their first assignment of error, the Johnsons contend that the judgment against them on the invasion of privacy claim is against the manifest weight of the evidence. The Johnsons assert the Morlatts "failed to establish the necessary legal predicates for any of their claims" because "the core of each claim centered upon three key allegations that are either false, or unproven: 1) that the Defendants/Appellants Johnsons do not own the land upon which the entirety of Johnson/Stoney Road is located, 2) that the Morlatts have proven a road right of way to Stoney Road that abuts the entire southern border of their property, and that 3) via the right of way, they have unrestricted

ability to construct any improvement in the right of way that they choose to do." [*Id.*] The Johnsons claim that the Morlatts "made no attempt to establish * * * where their property actually ends and whether they in fact have access to any road right of way that may exist." [*Id.* at 14] The Johnsons also claim that the Morlatts presented no evidence "that they ever sought or obtained a permit to make the improvements they started May 8, 2019."

{¶28} In addition, the Johnsons contend that the denial of an electricity easement and the driveway incident do not support an invasion of privacy claim because "[e]very aspect of the matters testified to [was] in the public domain—and in fact occurred in actual public." The Johnsons also claim they were "entirely within their rights" to question the removal of the posts and driveway construction. They assert that the Morlatts removed posts within the Johnsons' property line without permission and that the Morlatts did not conduct "a survey to ensure their right of way abutted their property at the location where they placed the driveway," obtain a permit, or advise the Johnsons of their plan. The Johnsons also assert that Mr. Johnson's act of swearing out a criminal mischief complaint is not an invasion of privacy.

{¶29} "The right of privacy is the right of a person to be let alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned." *Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956), paragraph one of the syllabus. Relevant here, one actionable invasion of the right of privacy is "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.* at paragraph two of the syllabus. This "has also been called

'intrusion upon seclusion.' " *Lunsford v. Sterilite of Ohio, L.L.C.*, 162 Ohio St.3d 231,

2020-Ohio-4193, 165 N.E.3d 245, ¶ 32.  The Supreme Court of Ohio has stated:

> "Intrusion upon seclusion" is based on the "right to be left alone." *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 111 Nev. 615, 630, 895 P.2d 1269 (1995).  It is "akin to trespass in that it involves intrusion or prying into the plaintiff's private affairs." *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d 163, 166, 499 N.E.2d 1291 (10th Dist.1985).  " 'One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.' " *Sustin v. Fee*, 69 Ohio St.2d 143, 145, 431 N.E.2d 992 (1982), quoting Restatement of the Law 2d, Torts, Section 652B (1977).  Whether an invasion of privacy has occurred turns on the particular facts of the case.  However, the right to privacy is not absolute.

(Citations omitted.)  *Id.* at ¶ 33.

{¶30} In this case, there is no evidence that the Johnsons intruded upon the

solitude or seclusion of the Morlatts or their private affairs or concerns.  The activities

intruded into—the electric crew's work and the driveway construction—were not private.

The activities occurred on or within view of a public right-of-way located on the Johnsons'

property.  The Morlatts had no reasonable expectation of privacy in the area in which the

intrusions occurred.  Therefore, we conclude that the judgment on the invasion of privacy

claim against the Johnsons is against the manifest weight of the evidence.  The trial court

clearly lost its way and created such a manifest miscarriage of justice that the judgment

must be reversed.  We sustain the first assignment of error, and we reverse the trial

court's judgment with respect to the invasion of privacy claim against the Johnsons.

### C.  Absolute Nuisance

{¶31} In their second assignment of error, the Johnsons contend that the

judgment against them on the absolute nuisance claim is against the manifest weight of

the evidence.  The Johnsons maintain that there is no evidence they engaged in any

"unlawful/intentional" acts. The Johnsons assert that they had no duty to grant the Morlatts an electricity easement and that Mr. Morlatt admitted on cross-examination that Mr. Johnson did not prevent " 'Rural Electric from putting a utility easement, electricity to [the Morlatt] property.' " With respect to the driveway incident, the Johnsons assert that the Morlatts removed fence posts which "did not belong to them" and "began dumping gravel and constructing a driveway in land owned by the Johnsons." The Johnsons argue that "[i]f by reason of a right of way the Morlatts are permitted to construct a driveway from Stoney Road to their property, they neither provided evidence of this right of way or that their property abutted it." Therefore, the Johnsons maintain that "it was imminently reasonable for [them] to believe the Morlatts were trespassing, or at a minimum, that the Morlatts were making improvements in a right of way without appropriate permits." The Johnsons also suggest that the Morlatts did not suffer harm which would support a nuisance claim because they "could not and did not prove diminished property value," "they offered no evidence of physical harm," and their "purported evidence of 'emotional injury' consisted of having to defend their attempt to conduct un-permitted, unfettered improvements on property either owned by the Johnsons, or subject to the road right of way."

{¶32} " 'There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' " *Brown v. Cty. Commrs. of Scioto Cty.*, 87 Ohio App.3d 704, 712, 622 N.E.2d 1153 (1993), quoting Prosser & Keeton, *The Law of Torts*, Section 86, 616 (5th Ed.1984). " ' "Nuisance" is a term used to designate the wrongful invasion of a legal right or interest.' " *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 17, quoting *Taylor v. Cincinnati*, 143 Ohio St. 426,

431-432, 55 N.E.2d 724 (1944). " 'It comprehends not only the wrongful invasion of the use and enjoyment of property, but also the wrongful invasion of personal legal rights and privileges generally.' " *Id.*, quoting *Taylor* at 432. "However, such right or interest may be invaded by any one of several types of wrongful conduct, and the liability of a defendant, in any case, depends upon the type of his wrongful conduct with respect to the right or interest invaded." *Taylor* at 432.

**{¶33}** A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Brown* at 712, citing Restatement of the Law 2d, Torts, Section 821D, at 100 (1979). "Unlike a public nuisance, a private nuisance threatens only one or few persons." *Ogle v. Ohio Power Co.*, 180 Ohio App.3d 44, 2008-Ohio-7042, 903 N.E.2d 1284, ¶ 7, citing *Taylor* at 442. "A private nuisance may be categorized as either an absolute or a qualified nuisance." *Adkins v. Boetcher*, 4th Dist. Ross No. 08CA3060, 2010-Ohio-554, ¶ 16. "As distinguished from a qualified nuisance involving negligence, an absolute nuisance consists of either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault." *Interstate Sash & Door Co. v. Cleveland*, 148 Ohio St. 325, 74 N.E.2d 239 (1947), paragraph one of the syllabus. In this case, the Morlatts alleged a claim for absolute nuisance against the Johnsons.

**{¶34}** "For there to be an action for nuisance, the injury must be real, material, and substantial." *Banford* at ¶ 17, citing *Eller v. Koehler*, 68 Ohio St. 51, 55, 67 N.E. 89 (1903). Moreover, "[i]t has long been recognized that a nuisance must materially interfere

with *physical comfort.*" (Emphasis added.) *Id.* at ¶ 28. *See also id.* at ¶ 22, quoting *Antonik v. Chamberlain*, 81 Ohio App. 465, 476, 78 N.E. 752 (9th Dist.1947), quoting 39 American Jurisprudence, Nuisance, Section 30 (explaining that in *Antonik*, the court "stated that a private nuisance 'generally turns on the factual question whether the use to which the property is put is a reasonable use under the circumstances, and whether there is "an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort, and not merely a tendency to injure. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort" ' "). " ' "The discomforts must be physical, not such as depend upon taste or imagination. But whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance * * *." ' " *Banford* at ¶ 28, quoting *Weishann v. Kemper*, 27 Ohio N.P. (N.S.) 269, 278 (1928), quoting *Cleveland v. Citizens Gas Light Co.*, 20 N.J.Eq. 201, 205-206 (1869).

{¶35} "Damages for nuisance may include diminution in the value of the property, costs of repairs, loss of use of the property, and compensation for annoyance, discomfort, and inconvenience." *Id.* at ¶ 17. However, the Supreme Court of Ohio has stated: "If the existence of a nuisance depends upon 'an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort,' then it logically follows that the element of physical discomfort must be present for a plaintiff to have been damaged by the nuisance. The same standard must apply whether evaluating the existence of a nuisance or evidence of the damages caused by the nuisance." *Id.* at ¶ 25. Thus, in *Banford*, the court held that "in order to recover damages for annoyance and discomfort in a nuisance claim, a plaintiff must establish that the nuisance caused physical discomfort," *id.* at ¶ 28,

even though the defendant in that case had admitted the existence of a nuisance, *id.* at ¶ 24. In doing so, the court observed that " '[c]ases supporting recovery for personal discomfort or annoyance involve either excessive noise, dust, smoke, soot, noxious gases, or disagreeable odors as a premise for awarding compensation.' " *Id.* at ¶ 26, quoting *Widmer v. Fretti,* 95 Ohio App. 7, 18, 116 N.E.2d 728 (6th Dist.1952). "These conditions affect one's sight, sound, smell, hearing, or touch, which may cause a physical discomfort." *Id.*

**{¶36}** In this case, the Morlatts failed to present evidence that they suffered the requisite injury for the existence of a nuisance. There is evidence from which a trier of fact could conclude that the Johnsons' conduct annoyed and inconvenienced the Morlatts because it resulted in a delay of unspecified duration in the Morlatts getting electric service to their property and a brief delay in the driveway construction. However, there is no evidence that the Johnsons created conditions that were offensive physically to the senses and materially interfered with the Morlatts' physical comfort. Although there is evidence the Johnsons made Mr. Morlatt uncomfortable using his property and letting his daughter live on it, "it is important to distinguish uncomfortable as an emotion versus being physically uncomfortable." *Scott v. Nameth*, 10th Dist. Franklin No. 14AP-630, 2015-Ohio-1104, ¶ 15. "The Supreme Court of Ohio in *Banford* is clear that '[i]t has long been recognized that a nuisance must materially interfere with physical comfort.' " *Id.*, quoting *Banford* at ¶ 28.

**{¶37}** We observe that in *Banford*, despite holding that a plaintiff must establish a nuisance caused physical discomfort to get damages for annoyance and discomfort, the court later stated that

a person may recover for annoyance and discomfort for a nuisance, including fear and other emotions, without a physical component if the annoyance or discomfort are connected to the person's loss of use or loss of enjoyment of property. In *Stoll v. Parrott & Strawser Properties, Inc.*, Warren App. No. CA2002-12-133, 2003-Ohio-5717, 2003 WL 22427815, ¶ 25, the jury awarded damages for annoyance and discomfort that the plaintiffs experienced in the use and enjoyment of their property. The plaintiffs testified that they had been unable to leave their property when it flooded due to work in a nearby development. After each flooding incident, they spent two to three days cleaning up debris in their yard.

*Banford*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, at ¶ 30. However, *Stoll* is distinguishable from this case. "In *Stoll,* the loss of use caused by flooding of the property was a real, physical loss of use." *Scott* at ¶ 17, citing *Banford* at ¶ 30 (noting nuisance "involves a restriction or infringement upon the use and enjoyment of property" and "must cause damages that are real, material, and substantial"). In this case, Mr. Morlatt testified that he discontinued use of his property because he was afraid of having additional negative interactions with the Johnsons and being charged with another crime. There is no physical reason the Morlatts cannot use their property. Fear and emotional discomfort are "not enough under the controlling standard articulated in *Banford*." *Id.* (qualified nuisance claim failed as matter of law where plaintiffs alleged they were uncomfortable in their home and yard because of defendants' security cameras but failed to allege or demonstrate damages from physical discomfort, failed to allege any physical manifestation of discomfort, and there was no physical reason they could not use their property).

{¶38} For the foregoing reasons, we conclude the trial court's judgment on the absolute nuisance claim against the Johnsons is against the manifest weight of the evidence. The trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. We sustain the second assignment of error,

and we reverse the trial court's judgment with respect to the absolute nuisance claim against the Johnsons.

## V.  ATTORNEY FEES

{¶39} In what we are treating as their third assignment of error, the Johnsons contend that the trial court erred when it awarded the Morlatts attorney fees. The Johnsons assert that "Ohio follows the 'American Rule,' which provides that a prevailing party in a civil action may not generally recover its attorney fees as part of the 'costs of litigation.' "  The Johnsons assert no exception to the rule applies in this case.

{¶40} "Ohio courts generally follow the 'American rule' with respect to attorney fees: each party is responsible for its own attorney fees." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, ¶ 9.  "[T]here are exceptions to this rule," *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7, but they "must be narrowly construed," *Dolan v. Glouster*, 4th Dist. Athens Nos. 11CA18, 12CA1, 11CA19, 12CA6, 11CA33, 2014-Ohio-2017, ¶ 113.  "Attorney fees may be awarded when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees, * * * or when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant * * *." *Wilborn* at ¶ 7.  Another exception "allows an award of attorney fees to the prevailing party as an element of compensatory damages when the [finder of fact] finds that punitive damages are warranted." *Phoenix* at ¶ 9.  "[W]here a case presents a legal issue regarding the availability of attorney fees, our review is de novo." *Shamrock v. Cobra Resources, LLC*, 2022-Ohio-1998, 191 N.E.3d 1197, ¶ 114 (11th

Dist.), citing *2-J Supply, Inc. v. Garrett & Parker, LLC*, 4th Dist. Highland No. 13CA29, 2015-Ohio-2757, ¶ 9 (reviewing de novo "the legal issue of whether the trial court erred in refusing to apply a rule of law concerning the availability of attorney's fees).

**{¶41}** The trial court did not articulate the basis for the attorney fee award in its August 5, 2020 entry. The Morlatts did not assert any statutory basis for such an award, there is no evidence of a contract between the Morlatts and Johnsons, and the trial court did not award any punitive damages. Even if the trial court concluded that the Morlatts demonstrated bad faith on the part of the Johnsons, in light of our rulings on the first and second assignment of error, the Morlatts are no longer the prevailing party with respect to any of their claims against the Johnsons. *See generally Black's Law Dictionary* (11th Ed.2019) (defining a "prevailing party" as one "in whose favor a judgment is rendered, regardless of the amount of damages awarded"). Therefore, we cannot discern any basis for deviation from the American Rule in this case, conclude the trial court erred when it awarded attorney fees, and sustain the third assignment of error.

## VI.  CONCLUSION

**{¶42}** For the foregoing reasons, we sustain the assignments of error, reverse the trial court's judgment, and remand for further proceedings consistent with this opinion.

JUDGMENT REVERSED
AND CAUSE REMANDED.

**APPENDIX**



## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE IS REMANDED.  Appellees shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**